**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| JEFFREY D.,[1] | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil No. 3:24-cv-555 (RCY) |
| | ) | |
| FRANK BISIGNANO,[2] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

In this action, Plaintiff Jeffrey D. seeks review of the Commissioner of the Social Security Administration's ("SSA") decision to deny his Title II application for disability insurance benefits and Title XVI application for Supplemental Security Income ("SSI"). This matter comes before the Court for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B) on cross-motions for summary judgment. (ECF Nos. 6, 12, 14.) The motions have been fully briefed (ECF Nos. 12, 13, 14, 15), making this matter ripe for review.

Plaintiff requests that the Court direct an award of benefits, or in the alternative, remand the case under sentence four of 42 U.S.C. § 405(g) and § 1383(c)(3). (ECF No. 13, at 11.) As the basis for such relief, Plaintiff argues that the Administrative Law Judge ("ALJ") erred by failing: (1) to develop the administrative record under the heightened standard applicable to *pro se*

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that federal courts refer to claimants by their first names and last initials in social security cases.

[2] Frank Bisignano was sworn in as the Commissioner of Social Security on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, he has been substituted for the former Commissioner as Defendant in this action. 42 U.S.C. § 405(g). No further action need be taken. 42 U.S.C. § 405(g).

claimants; and (2) to build a logical bridge between the evidence and the residual functional capacity ("RFC") assessment. (ECF No. 13, at 2-11.) In response, the Commissioner contends that the ALJ adequately developed the record and substantial evidence supports the ALJ's RFC assessment. (ECF No. 14, at 13-22.)

For the reasons set forth below, the Court finds that the ALJ failed both to adequately develop the record considering the evidentiary gaps and Plaintiff's *pro se* status at the hearing level and to construct a logical bridge between the evidence and the RFC assessment. Both failures frustrate this Court's ability to conduct meaningful judicial review and justify remand for further administrative proceedings. Therefore, the Court RECOMMENDS that: (1) Plaintiff's Motion for Summary Judgment (ECF No. 12) be GRANTED; (2) Defendant's Motion for Summary Judgment (ECF No. 14) be DENIED; (3) the final decision of the Commissioner be REVERSED; (4) the case be REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) and § 1383(c)(3) for further administrative proceedings consistent with this Report and Recommendation; and (5) final judgment be entered under Rule 58 of the Federal Rules of Civil Procedure.

## I.    PROCEDURAL HISTORY

On December 8, 2020, Plaintiff filed applications for disability insurance benefits and SSI, alleging disability beginning on January 1, 2015. (Administrative Record ("R.") at 93-94.)[3]  In his applications, Plaintiff alleged that he suffers from mental illness, Type I diabetes, neuropathy and vision problems associated with his diabetes, and "bad" nerve damage in his hands and feet. (R. at 95, 101.)  Plaintiff's applications for benefits were denied, both initially and upon

---

[3] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these rules, the Court will exclude personal identifiers from this Report and Recommendation. The Court will further restrict its discussion of Plaintiff's medical information to the extent necessary to result in a proper analysis of the case.

reconsideration.  (R. at 127, 132, 141, 146.)  Plaintiff requested a hearing before an ALJ, and one was held on May 11, 2023.  (R. at 34-76, 148-49.)

On July 21, 2023, the ALJ issued a written decision, finding Plaintiff not disabled under the Social Security Act ("the Act").  (R. at 16-29.)  On June 7, 2024, the SSA Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (R. at 1-3.)  Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).

## II.     STANDARD OF REVIEW

The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual has a disability "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." *Id.* § 423(d)(2)(A).

SSA regulations set forth a five-step process to determine whether an individual is disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Mascio v. Colvin*, 780 F.3d 632, 634-35 (4th Cir. 2015) (describing the ALJ's five-step sequential evaluation).  At step one, the ALJ reviews the claimant's current work activity to determine if he or she has been participating in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements.  *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  At step three, the ALJ determines

whether the medical impairments meet or equal an impairment listed in the regulations. *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  Between steps three and four, the ALJ determines the claimant's RFC, which accounts for the most the claimant can do despite his or her impairments.  *Id.* §§ 404.1545(a), 416.945(a)(1).

At step four, the ALJ assesses whether the claimant can perform his or her past employment given his or her RFC.  *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  The burden of proof remains with the claimant through step four of the analysis, and the claimant must prove that his or her limitations preclude the claimant from performing his or her past relevant work.  *See Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012).  If such past work can be performed, then benefits will not be awarded, and the analysis ends.  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).  However, if the claimant cannot perform his or her past work, the analysis proceeds to step five, and the burden then shifts to the Commissioner to show that the claimant can perform other work that is available in the national economy.  *See id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The Commissioner usually offers this evidence through the testimony of a vocational expert.  *See Mascio*, 780 F.3d at 635.

In reviewing a decision to deny benefits, the Court will affirm the SSA's "disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'"  *Id.* at 634 (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)).  Substantial evidence requires more than a scintilla but less than a preponderance of evidence and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion.  *See Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).  The substantial evidence standard "presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts."  *Dunn v.*

*Colvin*, 607 F. App'x 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). Thus, a decision by the Commissioner is not subject to reversal merely because substantial evidence would have supported a different conclusion. *Id.*

To determine whether substantial evidence exists, the Court must examine the record as a whole, but may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)); *see Craig*, 76 F.3d. at 589. The Court must consider the support for the Commissioner's decision and "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). If a fact is supported by substantial evidence, the Court must affirm, regardless of whether the Court agrees with such findings. *Hancock*, 667 F.3d at 476 (citing *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996)). If the Commissioner's findings are arbitrary or unjustified, then they are not supported by substantial evidence, and the Court must reverse the decision. *See Breeden*, 493 F.2d at 1007.

### III.    THE ALJ'S DECISION

The ALJ analyzed Plaintiff's disability claim under the five-step evaluation process. (R. at 19-29); *see* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Mascio*, 780 F.3d at 634. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since January 1, 2015 (the alleged onset date). (R. at 19.)

At step two, the ALJ found that Plaintiff suffered from the severe impairments of Type I diabetes mellitus, polyneuropathy[4], lipohypertrophy[5], right ankle fracture status post repair surgery, and carpal tunnel syndrome. (R. at 19-21.) In conducting this analysis, the ALJ considered the four broad areas of mental functioning (commonly called "paragraph B" criteria) and concluded that Plaintiff's medically determinable mental impairments "cause[d] no more than 'mild' limitation in any of the functional areas"[6] and were, therefore, non-severe. (R. at 20-21.)

In the first functional area of "understanding, remembering, or applying information," the ALJ found Plaintiff mildly limited. (R. at 20.) The ALJ acknowledged that Plaintiff and his mother reported that he needed "special reminders" to monitor his blood sugar, eat, and take his insulin when his blood sugar levels were unstable. (R. at 20.) In the second functional area, the ALJ found Plaintiff mildly limited in "interacting with others." (R. at 20.) While Plaintiff spent time with household members daily, the ALJ considered testimony that Plaintiff's unstable blood sugar levels affected his mood, made him angry and impatient, and limited his ability to get along with others. (R. at 20.) In addition, examination findings noted fluctuations in Plaintiff's mood and affect, "usually when he was experiencing very high or very low blood sugar levels or other

---

[4] Polyneuropathy, or peripheral neuropathy, is nerve damage commonly associated with diabetes that causes weakness, numbness, and pain, usually in the hands and feet. *Peripheral Neuropathy*, Mayo Clinic (Sept. 2, 2023), https://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/symptoms-causes/syc-20352061.

[5] Lipohypertrophy, a condition common in people with diabetes, "is a lump of fatty tissue under [the] skin caused by repeated injections in the same place." *Lipohypertrophy*, Cleveland Clinic (Apr. 29, 2022), https://my.clevelandclinic.org/health/diseases/22928-lipohypertrophy.

[6] The SSA evaluates the effects of a mental disorder on four areas of mental functioning based on a five-part rating scale. 20 C.F.R. Pt. 404, Subp. P, App. 1, § 12.00(F)(2). An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis in an area. C.F.R. Pt. 404, Subp. P, App. 1, § 12.00(F)(2)(e). A marked limitation exists when an impairment seriously limits the ability to do the same. 20 C.F.R. Pt. 404, Subp. P, App. 1, § 12.00(F)(2)(d). Moderate indicates a fair limitation, mild includes a slight limitation, and "no" or "none" means the claimant can function in the area independently, appropriately, effectively, and on a sustained basis. 20 C.F.R. Pt. 404, Subp. P, App. 1, § 12.00(F)(2)(a)-(c).

acute medical problems." (R. at 20.) Next, in the third functional area of "concentrating, persisting, or maintaining pace," the ALJ found Plaintiff had no limitations. (R. at 20.) However, Plaintiff and his mother asserted that the variability in his blood sugar levels contributed to an inability to focus and follow written and spoken instructions. (R. at 20.) Finally, despite testimony that Plaintiff's fluctuating blood sugar levels negatively impacted his ability to bathe, manage his stress, and handle changes in routine, the ALJ found Plaintiff had no limitations in "adapting or managing oneself." (R. at 20-21.)

At step three, the ALJ concluded that Plaintiff did not have an impairment, individually or in combination, which met or medically equaled a disability listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21-22.)

Based on the record, the ALJ found that Plaintiff retained the ability to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) with the following limitations:

> [Plaintiff] can lift and/or carry 20 pounds occasionally and 10 pounds frequently. He can sit for six hours and stand and/or walk for six hours in an eight-hour workday. He can occasionally climb ramps or stairs, but never climb ladders, ropes, or scaffolds. He can frequently balance, and occasionally stoop, crouch, and crawl. He can tolerate occasional exposure to vibrations, but no exposure to unprotected heights or moving mechanical parts. He can frequently handle (gross manipulation), finger (fine manipulation), and feel (with skin receptors) with his bilateral upper extremities. He can occasionally operate foot controls with his bilateral lower extremities. He is limited to performing simple routine tasks only.

(R. at 22-23.)

In arriving at the RFC, the ALJ first summarized Plaintiff's subjective complaints. (R. at 23-24.) Plaintiff testified that his diabetes impacted his mental condition, particularly when his blood sugar was high, as it interfered with his ability to think, concentrate, comprehend, and follow directions. (R. at 23.) He stated that his insulin pump had been "helpful in some ways," but the pump also lowered his blood sugar "too much" and caused the insulin to "hit[] him quick." (R. at 23.) He reported that his blood sugar levels were usually "off in the morning," which "cause[d]

problems with getting around." (R. at 23.) Plaintiff further testified that his diabetes caused his hands to swell "[e]very morning" and that the neuropathy in his fingers was "bad" due to checking his blood sugars. (R. at 23.) While Plaintiff testified that he could eat using utensils, and pick up a glass and a coin off a table, he also stated that his neuropathy made it difficult to lift objects and caused him to drop things. (R. at 23.) Plaintiff reported that he took vitamin B12 to help with the swelling and that he had to warm his hands in the morning; otherwise, he could not make a fist. (R. at 23.) At the May 2023 hearing, Plaintiff stated that he had not seen an endocrinologist or primary care physician in over a year but had an upcoming appointment with an endocrinologist. (R. at 23.)

Next, the ALJ considered Plaintiff's activities of daily living. (R. at 23.) Plaintiff reported that he lived with his mother and stepfather. (R. at 23.) He did not do any household chores and "just t[ook] care of himself," which included bathing, dressing, and making "a sandwich or something easy to eat." (R. at 23.) Plaintiff stated that he could drive but had transportation issues. (R. at 23, 57 (indicating Plaintiff had a vehicle but did not have car insurance).) Plaintiff further testified that while he was unable to work due to fluctuations with his diabetes and a fear that he would hurt himself, he had applied for jobs but received no response. (R. at 23.)

The ALJ then detailed Plaintiff's medical records pertaining to his impairments. (R. at 24-26.) The ALJ considered Plaintiff's history of Type I diabetes mellitus with associated polyneuropathy and lipohypertrophy. (R. at 24.) In April 2015, Plaintiff was hospitalized for diabetic ketoacidosis after he stopped taking his insulin. (R. at 24.) The ALJ emphasized that Plaintiff's compliance with treatment varied in large part due to financial issues and gaps in insurance coverage. (R. at 24.) However, upon hospitalization, Plaintiff's diabetic ketoacidosis improved with treatment. (R. at 24.) Since April 2015, treatment notes have generally described

Plaintiff's diabetes as "uncontrolled."  (R. at 24.)  Specifically, Plaintiff has had uncontrollable hemoglobin A1c levels, ranging from a high of 12.6 percent in April 2015 to a low of 8.7 percent in February 2021, and suboptimal glucose control despite frequent adjustments to his insulin usage.  (R. at 24.)  But the ALJ also noted that in August 2017, Plaintiff's blood sugar levels were relatively stable with inpatient treatment and management.  (R. at 24.)

In addition, the ALJ noted the "unremarkable" physical examinations.  (R. at 24.)  Specifically, the ALJ emphasized that while examination notes showed swelling and tenderness in both hands, some decreased sensation in the left foot, and subcutaneous lipohypertrophy in the lower left abdomen, those notes also indicated normal musculoskeletal, normal cardiovascular, normal bilateral feet findings, and normal gait and coordination.  (R. at 24.)  Plaintiff's polyneuropathy was treated with vitamin B12, folic acid, and Gabapentin.  (R. at 24.)  He was also advised that his lipohypertrophy would need to be surgically removed if it continued to grow, but treatment notes suggested that insurance would not cover any surgical treatment unless Plaintiff had an infection.  (R. at 24.)  Plaintiff was advised that improving his hemoglobin A1c would help decrease the swelling in his hands, but he continued to experience "wide fluctuation in his blood sugar levels" and "worsening left hand pain" and swelling.  (R. at 24.)

In early 2021, Plaintiff received an insulin pump and a Dexcom monitor.  (R. at 25.)  He subsequently reported doing well with the pump and Dexcom monitor, and a May 2021 report from the Dexcom monitor confirmed that Plaintiff's blood sugars were in the target range 69 percent of the time.  (R. at 25.)  However, insurance denied coverage for the Dexcom monitor in mid-January 2023.  (R. at 25.)  That same month, Plaintiff reported constant symptoms of hyperglycemia, i.e., high blood sugar, but was noted to have normal pulses bilaterally, normal musculoskeletal with normal range of motion in both feet, normal sensation bilaterally with normal

9

skin integrity, and normal cardiovascular, abdominal, and neurological findings.  (R. at 25.)

Despite the relatively normal examination findings, Plaintiff was diagnosed with uncontrolled

Type I diabetes with hyperglycemia, retinopathy, and polyneuropathy.  (R. at 25.)  Notably,

Plaintiff's Type 1 diabetes was described as "uncontrolled" despite being on the insulin pump.  (R.

at 25.)

Based on these findings, the ALJ concluded that Plaintiff's history of Type I diabetes with

polyneuropathy and lipohypertrophy "support[ed] limiting him to light work with additional

exertional, postural, manipulative, environmental, and non-exertional limitations," including

limiting him to performing simple routine tasks.  (R. at 25, 27.)[7]

As for Plaintiff's carpal tunnel syndrome, the ALJ noted that Plaintiff first reported pain

and swelling in both of his hands in early 2020.  (R. at 25.)  On examination, Plaintiff's hands were

swollen and tender, and nerve conduction and electromyography ("EMG") studies suggested

severe bilateral carpal tunnel syndrome that was greater in the left hand.  (R. at 25.)  Plaintiff

continued to report significant bilateral numbness and tingling and subsequent examinations

showed positive carpal compression Phalen's and Tinel's signs.[8]  (R. at 25.)  In May 2020, Plaintiff

underwent a left carpal tunnel release.  (R. at 25.)  A week-and-a-half later, Plaintiff had

---

[7] The ALJ also considered Plaintiff's right ankle status post repair surgery with screws.  (R. at 25.)
The ALJ noted that it was not clear when this procedure occurred based on the record.  (R. at 25.)
However, examination findings showed some diminished sensation but otherwise normal bilateral
pulses, no motor weakness, normal deep tendon reflexes, normal range of motion in both feet, and
a normal gait.  (R. at 25.)  Thus, the ALJ noted that Plaintiff's right ankle impairment limited him
to light work with additional restrictions.  (R. at 25.)
[8] These are diagnostic tests for carpal tunnel syndrome.  A Phalen's sign is performed by bending
the wrists downwards and placing the backs of the hands together for one minute, whereas a Tinel's
sign is performed by a healthcare provider tapping the skin above the nerve.  *Phalen's Test*,
Cleveland Clinic (July 18, 2023), https://my.clevelandclinic.org/health/diagnostics/25133-
phalens-test#test-details;   *Tinel's   Sign*,   Cleveland   Clinic   (Apr.   1,   2022),
https://my.clevelandclinic.org/health/diagnostics/22662-tinels-sign.   Both tests are considered
positive if tingling or numbness is present.  *Id.*

"improv[ed] sensation," could move all five fingers with intact perfusion, and was told to complete his range of motion exercises and use a brace during "heavy activities."  (R. at 25.)  A month later, in late June 2020, Plaintiff began reporting pain, weakness, numbness, and tingling.  (R. at 25.)  Examination notes showed weakness in grip strength in the left hand but otherwise no sensory deficits, good wrist range of motion with mild discomfort, only mild swelling and tenderness over the incision site, and an ability to make a fist and extend all five fingers.  (R. at 25-26.)  Based on these findings, Plaintiff was referred to occupational therapy, but he had not followed up since June 2020.  (R. at 26.)  The ALJ found that Plaintiff's carpal tunnel syndrome limited him to light work with postural, manipulative, and environmental limitations.  (R. at 26.)

After considering the medical record evidence, the ALJ concluded that "[v]arious factors" were inconsistent with Plaintiff's allegations of symptom severity.  (R. at 26.)  First, the ALJ noted that treatment records showed Plaintiff's diabetes was relatively stable with consistent treatment while also emphasizing that he "ha[d] not always been consistent with his insulin, often due to financial issues."  (R. at 26.)  Second, the ALJ acknowledged Plaintiff's polyneuropathy, carpal tunnel syndrome, and painful lipohypertrophy, but found examinations showed only occasional decreased sensation, full motor strength, normal gait, normal range of motion, and that his lipohypertrophy did not interfere with his mobility and movement.  (R. at 26.)  Third, Plaintiff could perform a wide range of daily activities, including working on a part-time basis after the alleged onset date, despite his impairments.  (R. at 26.)  For these reasons, the ALJ found that Plaintiff's impairments imposed "some limitations" and "the degree of limitation that [was] consistent with the record ha[d] been accounted for" in the RFC.  (R. at 26.)

The ALJ then considered medical opinions and prior administrative medical findings.  (R. at 26-27.)  In reviewing Plaintiff's application for disability insurance benefits, state agency

reviewing physicians, William Rutherford, Jr., M.D. and Robert McGuffin, Jr., M.D., and state agency reviewing psychologists, Richard Luck, Ph.D. and Joseph Leizer, Ph.D., found that "there was insufficient evidence with which to support a determination before" March 31, 2020 (the date last insured).  (R. at 19, 26.)

As for Plaintiff's SSI application, in July 2021, Dr. Rutherford opined that Plaintiff's physical impairments were non-severe, whereas Dr. McGuffin found in March 2022 that Plaintiff had severe physical impairments.  (R. at 26.)  Because the record showed semi-controlled diabetes, hyperglycemia, carpal tunnel syndrome, and bilateral hand nerve damage, Dr. McGuffin limited Plaintiff to never climbing ladders, ropes, or scaffolds and no concentrated exposure to vibration and hazards.  (R. at 26.)  The ALJ compared these opinions and found Dr. McGuffin's opinion more consistent with the record evidence, which demonstrated that Plaintiff's diabetes continued to be uncontrolled and that he had a normal bilateral ankle range of motion and a left carpal tunnel release with no follow-up since a month after the procedure.  (R. at 26-27.)

Again, in reviewing Plaintiff's SSI application, Dr. Luck opined that Plaintiff's mental impairments were non-severe in July 2021, and Dr. Leizer affirmed those findings in March 2022. (R. at 27.)  The ALJ found these opinions "generally consistent with the evidence in the record" as the state agency reviewing psychologists noted unremarkable mental status examinations, no psychiatric admissions, and that Plaintiff did not seek out mental health treatment.  (R. at 27.)

After completing the RFC assessment, the ALJ found at step four that Plaintiff had no past relevant work.  (R. at 27.)  The ALJ then determined Plaintiff's vocational factors, including that he had at least a high school education and met the definition of a younger individual at the alleged onset date.  (R. at 28.)  At step five, the ALJ considered Plaintiff's vocational factors and RFC to determine whether Plaintiff could perform jobs that exist in significant numbers in the national

economy. (R. at 28-29.) The ALJ adopted the vocational expert's testimony that Plaintiff could perform the jobs of hand bander, sorter II, and garment tag stringer despite his limitations. (R. at 28-29.) Therefore, the ALJ found Plaintiff not disabled from January 1, 2015 (the alleged onset date) through July 21, 2023 (the date of the decision). (R. at 29.)

## IV.    ANALYSIS

Plaintiff raises two challenges to the ALJ's decision. The Court addresses each argument below, finds error precluding meaningful judicial review, and recommends remand for further administrative proceedings.

### A.    The ALJ Failed to Adequately Develop the Record Given Plaintiff's *Pro Se* Status

Plaintiff argues that the ALJ failed to develop the administrative record, especially given his *pro se* status at the administrative hearing. (ECF No. 13, at 2-7; ECF No. 15, at 1-7.) Specifically, Plaintiff contends that "the ALJ failed to perform his duty to develop a complete medical history," including by not requesting treatment records from Gloria Galdamez, M.D., Plaintiff's primary care provider who treated Plaintiff from 2015 to 2020.[9] (ECF No. 13, at 3-4; ECF No. 15, at 2-3.) Defendant asserts that the ALJ properly developed the record and even if not, Plaintiff has not shown any prejudice. (ECF No. 14, at 13-19.) The Court finds the ALJ failed to properly develop the record given Plaintiff's *pro se* status at the hearing level and the significant gaps in Plaintiff's medical records.

---

[9] Plaintiff also contends that the ALJ erred by failing to request mental health records and occupational therapy records, which were referenced elsewhere in his medical records, and by failing to solicit opinions through medical interrogatories, expert testimony, or a consultative medical examination from an endocrinologist or any treating or examining physician. (ECF No. 13, at 4-7; *see also* ECF No. 15, at 4-6.) As explained in further detail below, the Court finds remand appropriate based on the ALJ's failure to adequately develop a complete medical record. Because the Court recommends remand for further administrative proceedings, the Court need not address these additional arguments.

A claimant in a social security case is entitled to a full and fair hearing of his or her claims. *Lewis v. Astrue*, No. 3:08-cv-82, 2008 WL 4889126, at *5 (E.D. Va. Nov. 12, 2008) (citing *Sims v. Harris*, 631 F.2d 26, 27 (4th Cir. 1980)). "While lack of representation by counsel is not by itself an indication that a hearing was not full and fair, it is settled that where the absence of counsel created clear prejudice or unfairness to the claimant, a remand is proper." *Sims*, 631 F.2d at 27-28. "One form of prejudice continuously recognized by the Fourth Circuit is an ALJ's failure to fully develop the record, especially where the claimant is proceeding *pro se.*" *Lewis*, 2008 WL 4889126, at *5 (citing *Walker v. Harris*, 642 F.2d 712, 714 (4th Cir. 1981)). Indeed, the ALJ has a heightened "duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record" where the claimant is unrepresented. *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (references omitted); *Teachey v. Colvin*, No. 4:14-cv-178, 2016 WL 958201, at *3 (E.D.N.C. Mar. 8, 2016), *aff'd*, 671 F. App'x 150 (4th Cir. 2016); *see also* 20 C.F.R. §§ 404.1512(b)(1), 416.912(b)(1).

As part of this heightened and more active duty, "the ALJ should 'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts,' being 'especially diligent in ensuring favorable as well as unfavorable facts and circumstances are elicited.'" *Lewis*, 2008 WL 4889126, at *5 (quoting *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980)). "Even in cases where the record presented to the Court contains substantial evidence to support the ALJ's determination, the Court may exercise its authority to remand the case for additional fact finding where the ALJ did not fully and conscientiously develop the record." *Id.*; *see also Cannon v. Comm'r of Soc. Sec. Admin.*, No. 3:21-cv-351, 2022 WL 4480313, at *2 (W.D.N.C. Aug. 26, 2022), *report and recommendation adopted sub nom.*, *Cannon v. Kijakazi*, 2022 WL 4476761 (W.D.N.C. Sept. 26, 2022).

Plaintiff chose to proceed without counsel at the administrative hearing, even though the ALJ advised him of the right to postpone the hearing to obtain representation. (R. at 38-39.) Thus, the ALJ had a heightened responsibility to develop the record considering Plaintiff's *pro se* status.[10] *Lewis*, 2008 WL 4889126, at *5 ("[W]hen [p]laintiff opted to proceed without counsel, the ALJ had a heightened responsibility to develop the record, including raising all relevant facts and issues involved."). Yet, based on the specific circumstances in this case, the ALJ did not fulfill his heightened obligation to develop the record.

Plaintiff persuasively argues that the ALJ failed to develop the record because of the absence of records from Plaintiff's primary care providers. (ECF No. 13, at 3-4; ECF No. 15, at 2-4.) The medical records reviewed by the ALJ largely consisted of hospital records documenting various emergency room visits or inpatient hospitalizations in which Plaintiff received treatment for abscesses, diabetes, or hepatitis C. (*See* R. at 1148, 1193, 1770, 2058, 2155, 2296, 2302.) While the hospital records discussed or included partial medical records related to some of Plaintiff's severe impairments, including his diabetes and polyneuropathy, the administrative record does not contain records regarding the actual treatment and management of Plaintiff's diabetes and related impairments from his primary care providers. Thus, although the ALJ acknowledged Plaintiff's history of uncontrolled diabetes and associated conditions of polyneuropathy and lipohypertrophy, he failed to obtain records from the providers who directly treated those conditions.

Plaintiff identified Dr. Galdamez as his primary care provider from 2015 to 2020 in his disability report. (R. at 245.) The hospital records also repeatedly referenced Plaintiff's primary care relationship with Dr. Galdamez, in addition to the Moss Free Clinic, for the purpose of

---

[10] Plaintiff obtained counsel after the ALJ issued his written decision. (R. at 9-12, 212-13.)

15

managing his diabetes and obtaining insulin prescriptions.[11]  (R. at 920, 2274, 3207, 3209, 3211, 3798, 3801, 3891, 3904, 4347.)  In addition, hospital records referred to scheduled follow-up appointments with Plaintiff's primary care providers, but the record contains no evidence pertaining to those appointments or the providers' findings at those examinations.  (*See* R. at 1100, 2936, 3072, 3213, 3804, 3196, 3701, 3715, 4462.)  Despite the repeated references to a primary care provider, the ALJ did not attempt to fill the gaps between Plaintiff's emergency room visits and inpatient hospitalizations by requesting records from primary treating sources.  Thus, the administrative record did not include Plaintiff's complete medical history for the relevant period.[12]

---

[11] The Court acknowledges that other portions of the hospital records listed no primary care provider for Plaintiff.  (*See* R. 797, 942, 2143, 2405.)  Despite these discrepancies, the record makes clear that Plaintiff received treatment, including medication management, for his diabetes throughout the alleged disability period, but those records are missing.  Although the ALJ generally asked Plaintiff if the medical record was complete (to which Plaintiff confirmed it was) (R. at 42), the ALJ did not ask follow-up questions relating to Plaintiff's treatment with Dr. Galdamez or other treating source for his severe impairments.  *See Lewis*, 2008 WL 4889126, at *6 ("[B]ecause of [p]laintiff's *pro se* status, the ALJ had the duty to ask pertinent questions relating to [p]laintiff's disability in order to ensure that his analysis was thorough and complete."); *Fleming v. Barnhart*, 284 F. Supp. 2d 256, 273-74 (D. Md. 2003) (finding that the ALJ failed to develop the record where "there [were] serious gaps in the plaintiff's medical records" and noting that the ALJ "should have developed the record by obtaining these records, or at least by advising the plaintiff that he should do so and leaving the record open").  Moreover, even though Plaintiff initially stated that the record was complete, during the hearing, the ALJ identified recent records from Mary Washington Hospital which were missing and properly requested those.  (R. at 52-55, 4452.)  Despite that supplemental record request, the administrative record remains devoid of records pertaining to Plaintiff's primary care treatment for his diabetes and related conditions.

[12] The administrative record does contain, within the hospital records, patient plans, diagnostic orders, or neurology referrals prepared by Dr. Galdamez and dated between December 2019 and February 2020.  (R. at 3750-53, 3781-82, 3794-95, 3798-3803.)  Still, given the small window of time for those records, the alleged disability onset date of January 1, 2015, and the ALJ's finding that Plaintiff's diabetes was uncontrolled for a majority of the alleged disability period, those records do not sufficiently fill the evidentiary gap in this case.

The Court also acknowledges that the administrative record in this case is fairly lengthy, comprising over 4,500 pages.  The length of the record, however, does not change the fact that a large portion of treatment records pertaining to severe impairments from 2015 to 2020 are not included.

Despite this evidentiary gap, the Commissioner argues that Plaintiff has not shown prejudice warranting remand.  (ECF No. 14, at 16.)  Specifically, the Commissioner contends that Plaintiff has not shown that the additional records might have led to a different result.  (ECF No. 14, at 16.)  The Court finds otherwise.  The presence of these records—specifically, five years' worth of primary care records and medication management for his uncontrolled diabetes and related impairments—certainly might have led the ALJ to make a different finding.  State agency reviewing physicians even identified "a large gap in treatment records during the relevant time frame" and concluded that "there [was] insufficient evidence to support an RFC" for January 2015 through March 2020.  (R. at 26 (citing R. at 97, 112).)  The missing records would likely have provided insight into Plaintiff's diabetes management and the effectiveness of any treatment regimen during periods other than the acute care he received during emergency room visits and inpatient hospitalizations.  This evidentiary gap cannot be considered harmless error, because the Court cannot properly evaluate whether the ALJ's decision finds substantial evidentiary support in the absence of those records.

While the Court recognizes that the ALJ is not required to obtain all of Plaintiff's medical records in making a disability determination, in this case, the ALJ had a heightened obligation to address the significant gaps in the medical records given Plaintiff's *pro se* status.  Here, the ALJ did not "scrupulously and conscientiously . . . probe into, inquire of, and explore for all the relevant facts" when he neglected to obtain additional records.  *Lewis*, 2008 WL 4889126, at *5 (quoting *Marsh*, 632 F.2d at 300).  The available records make clear that Plaintiff received treatment for his severe impairments, including his diabetes, from primary care providers, but those records are missing.  Given Plaintiff's *pro se* status at the administrative hearing and because significant treatment records are missing from the administrative record, the Court remands this case for

17

further development of the medical record.  On remand, the ALJ should seek to obtain a complete

medical history for Plaintiff during the relevant disability period.

**B.**  **The ALJ Failed to Build a Logical Bridge Between the Evidence and His RFC Findings**

Plaintiff also argues that the ALJ failed to build a logical bridge between the evidence and

his RFC determination.  (ECF No. 13, at 7-11; ECF No. 15, at 7-9.)  The Court agrees and

recommends remand on this issue to give the ALJ an opportunity to consider the record, including

Plaintiff's complete medical history, and provide a narrative discussion of how the evidence

supports his conclusions.

"[T]he ALJ 'must build an accurate and logical bridge from the evidence to [his]

conclusions.'"  *Johnson v. Comm'r of Soc. Sec.*, No. 22-1600, 2023 WL 8825295, at *1 (4th Cir.

Dec. 21, 2023) (quoting *Arakas v. Comm'r Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020)); *see*

*also Oakes v. Kijakazi*, 70 F.4th 207, 212-17 (4th Cir 2023).  The "obligation to provide a 'logical

explanation' for [his] findings 'is just as important as' whether [his] conclusions are supported by

substantial evidence."  *Johnson*, 2023 WL 8825295, at *2 (quoting *Thomas v. Berryhill*, 916 F.3d

307, 311 (4th Cir. 2019)).  The failure to build that logical bridge constitutes error.  *Id.*

In this case, the ALJ failed to build the required logical bridge between the evidence and

his RFC findings.  In summarizing the available medical records (which, as discussed above, has

a large evidentiary gap), the ALJ acknowledged that Plaintiff frequently had varying hemoglobin

A1c levels, suboptimal glucose control, and a diagnosis of uncontrolled diabetes, which negatively

affected his ability to remember to take his insulin, interact with others, focus, follow written or

spoken instructions, and manage his stress.  (R. at 20-21 (citing R. at 250, 253), 24-25.)  The ALJ

also noted that Plaintiff exhibited swelling and tenderness in both hands, joint mobility issues in

both feet, some decreased sensation in the left foot, and subcutaneous lipohypertrophy in the lower

left abdomen.  (R. at 24 (citing R. at 3203-04, 4440-41).)  Finally, the ALJ noted that Plaintiff received approval for an insulin pump and a Dexcom monitor in 2021 (six years after his alleged onset date) and did well with his pump and monitor, although he still reported nearly constant symptoms of hyperglycemia.  (R. at 25.)  Despite these findings, the ALJ noted that physical examination findings were "relatively unremarkable" and his diabetes "became relatively stable" with consistent treatment.  (R. at 24.)  The ALJ then concluded that Plaintiff's diabetes, polyneuropathy, and lipohypertrophy limited him to light work with additional exertional, postural, manipulative, environmental, and non-exertional limitations specified in the RFC.  (R. at 25.)  The ALJ, however, failed to connect the evidence to the limitations found appropriate in his RFC determination.  *See Johnson*, 2023 WL 8825295, at *1 ("Although the ALJ cited evidence to support her findings, that evidence does not build an accurate and logical bridge to those findings.").

The ALJ's conclusions regarding Plaintiff's subjective complaints do not resolve this deficiency, particularly as it relates to limitations stemming from Plaintiff's diabetes.  The ALJ found that "[v]arious factors are inconsistent with limitations to the degree alleged" (R. at 26), but those factors still do not build the required logical bridge.  For example, the ALJ concluded that Plaintiff's "diabetes responded to consistent treatment (such as when he was hospitalized), and became relatively stable."  (R. at 26.)  The ALJ did not explain how he reached this conclusion given the description of Plaintiff's diabetes as uncontrolled throughout the medical records and the missing treatment records from a primary treating source for Plaintiff's conditions from 2015 to 2020.  To the extent that the ALJ found Plaintiff's condition stabilized with the receipt of the insulin pump and Dexom monitor, that did not occur until 2021 (six years after the alleged onset

date), and the ALJ did not explain why the RFC would be appropriate in the multiple years before Plaintiff's condition stabilized.[13]

As another example, the ALJ concluded that Plaintiff's ability "to perform a wide range of his activities of daily living" and work part-time suggests that his limitations are not as severe. (R. at 26.) At the same time, the ALJ acknowledged that "fluctuations in his blood sugar levels seem to interfere with" those activities. (R. at 26.) The ALJ does not explain how the RFC accounts for Plaintiff's restrictions even though he suffered from uncontrolled diabetes and testified that he experienced fluctuations in blood sugar levels throughout the disability period.

Ultimately, the ALJ did not adequately explain how Plaintiff's uncontrolled diabetes and related conditions translated into limitations accounted for within the RFC determination. The lack of a logical explanation frustrates this Court's ability to conduct a meaningful judicial review and justifies remand. *See Mascio*, 780 F.3d at 636 (noting that "[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.").

---

[13] In finding that Plaintiff's condition responded to consistent treatment and eventually stabilized, the ALJ also noted that Plaintiff "has not always been consistent with his insulin, often due to financial issues." (R. at 26.) Plaintiff accuses the ALJ of holding his financial inability to obtain treatment against him in violation of Social Security Ruling 16-3p. (ECF No. 13, at 9-10.)

Under Social Security Ruling 16-3p, an ALJ may find the alleged intensity and persistence of a claimant's symptoms inconsistent with the overall record evidence where the claimant "fail[ed] to follow prescribed treatment that might improve symptoms." SSR 16-3p, 2016 WL 1119029, at *8 (Mar. 16, 2016). An ALJ, however, must consider possible reasons why a claimant may not comply with or seek treatment, including that "[a]n individual may not be able to afford treatment and may not have access to free or low-cost medical services." *Id.* at *9.

Given the lack of a logical explanation, the Court cannot determine how the ALJ weighed Plaintiff's lack of consistent treatment in connection with the RFC finding. In any event, because the Court remands on other grounds, it need not determine whether the ALJ properly considered Plaintiff's inability to afford treatment. Nevertheless, Social Security Ruling 16-3p should be considered if applicable in future administrative proceedings on remand.

**C.** **Remand for Further Proceedings, Rather Than an Award of Benefits, Is the Appropriate Remedy**

Plaintiff "requests that the Court direct an award benefits, or, in the alternative, remand this case for further development and analysis under the fourth sentence of 42 U.S.C. §§ 405(g) and 1383(c)(3)." (ECF No. 13, at 11; ECF No. 15, at 10.) The Court declines to direct the award of benefits and instead recommends that this matter be reversed and remanded for further administrative proceedings.

Section 405(g) of the Act authorizes the Court to reverse the administrative decision, "with or without remanding the cause of rehearing." 42 U.S.C. § 405(g); *see also id.* § 1383(c)(3). Where, as here, the Court "has no way of evaluating the basis for the ALJ's decision, then the 'proper course, *except in rare circumstances*, is to remand to the agency for additional investigation or explanation.'" *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) (emphasis added). On the other hand, reversal with a direct award of benefits would be appropriate "*[o]nly* in the unusual case" where it is "clear on review, despite the absence of an explanation from the ALJ, that the record does *not* contain substantial evidence that could support" a denial of benefits. *Carr v. Kijakazi*, No. 20-2226, 2022 WL 301540, at *4 (4th Cir. Feb. 1, 2022) (first emphasis added) (unpublished). In other words, reversal without remanding for further proceedings would be appropriate only "where the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." *Breeden*, 493 F.2d at 1012.

Here, Plaintiff does not explain why his case is a "rare circumstance" in which a direct award of benefits is the appropriate remedy for the ALJ's failure to develop the record or provide a logical explanation for the RFC finding. *Radford*, 734 F.3d at 295. While the Court recognizes that Plaintiff's alleged disability onset dates back over 10 years, "the Fourth Circuit has made clear

21

that the length of the process alone is insufficient cause to direct an award of benefits . . . ." *Melanie Z. v. O'Malley*, No. 3:23-cv-425, 2024 WL 4269672, at *2 n.5 (E.D. Va. Sept. 23, 2024) (citing *Carr*, 2022 WL 301540, at *5). Moreover, in this case, evidentiary gaps in the record preclude this Court's ability to properly assess Plaintiff's claims, which the ALJ needs to do in the first instance. *Id.* at *3 (citing *Radford*, 734 F.3d at 296) (declining to direct an award of benefits where the record was incomplete because the Court should not fill in evidentiary gaps). Even considering the incomplete record and lack of a logical explanation supporting the RFC determination, Plaintiff's disability and entitlement to benefits is not clearly established and further development of the record is needed for meaningful judicial review.

Therefore, remand for further evaluation, rather than a direct award of benefits, is the appropriate remedy. In remanding this case, the Court expresses no opinion as to the merits of Plaintiff's claim for disability insurance benefits and SSI. Instead, the Court only finds that the ALJ's failure to adequately develop the record and sufficiently explain his findings prevents this Court from undertaking a meaningful review of his decision.

## V.    CONCLUSION

For the reasons set forth above, the Court RECOMMENDS that: (1) Plaintiff's Motion for Summary Judgment (ECF No. 12) be GRANTED; (2) Defendant's Motion for Summary Judgment (ECF No. 14) be DENIED; (3) the final decision of the Commissioner be REVERSED; (4) the case be REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) and § 1383(c)(3) for further administrative proceedings consistent with this Report and Recommendation; and (5) final judgment be entered under Rule 58 of the Federal Rules of Civil Procedure.

Let the clerk forward a copy of this Report and Recommendation to the Honorable United States District Judge Robert C. Young and to all counsel of record.

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings, conclusions, and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report, and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

/s/

Summer L. Speight
United States Magistrate Judge

Richmond, Virginia
Date: August 14, 2025